## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:15-cr-415-RDP-SGC** |
| | } | |
| **GERARD EARL RATCLIFF,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

This case is before the court on Defendant Gerard Earl Ratcliff ("Ratcliff" or "Defendant")'s Motion To Suppress (Doc. # 15), filed February 2, 2016.  In his Motion, Ratcliff has moved to suppress all evidence and statements obtained from what he contends was a warrantless search and a warrantless arrest, in violation of his rights under the Fourth and Fifth Amendments.  (Doc. # 15).  Specifically, Ratcliff claims five discrete violations of his Fourth and Fifth Amendment protections by the Pleasant Grove Police Department.  He contends that the police officers (1) conducted a warrantless search of his garage, (2) arrested him in his home without a warrant, (3) elicited incriminating statements from him in violation of *Miranda v. Arizona*, 385 U.S. 436 (1966), (4) entered his residence and conducted an unlawful protective sweep, and (5) unlawfully searched his residence and seized evidence from his home.  (*Id.*).  He also asks the court to suppress all evidence seized after the police officers obtained a search warrant because, he argues, that warrant was based on unconstitutionally procured information.  (*Id.*).

The court conducted two hearings on the Motion on March 22, 2016 (Doc. # 25) and

April 14, 2016 (Doc. # 34).[1]   The court ordered the parties to submit supplemental briefing and responses, and on April 29, 2016, Ratcliff filed his Post-Hearing Brief in Support of Motion To Suppress.  (Doc. # 35).  On May 6, 2016, the United States filed a Response to Defendant's Supplemental Filing.  (Doc. # 36).  After initial review, the court determined that additional briefing on three issues would assist it in resolving Ratcliff's Motion.[2]  (Doc. # 37).  The parties simultaneously filed that supplemental briefing on July 1, 2016.  (Docs. # 38, 39).  They both filed responses on July 8, 2016.  (Docs. # 40, 41).  The Motion is now fully briefed and ripe for review.

## I.     Findings of Fact

Based upon the evidence presented at the hearings, the court makes the following factual findings:

1.      On November 3, 2015, at approximately 2:30 p.m., employees at the George Carr Buick Cadillac dealership in Vicksburg, Mississippi, discovered that a 2015 cream-colored Cadillac Escalade was missing from their lot.  Employees of the dealership had last seen the

---

[1] During the March 22, 2016 hearing, it was discovered that Lieutenant Daniel Reid had made some after-the-fact alterations to the police report prepared by the officers present at Ratcliff's house.  (*See* Doc. # 25).  During the April 14, 2016 hearing the specifics of those alterations came to light.  (*See* Doc. # 34).  They have no material bearing on the facts or law currently before the court, and do not affect the credibility of any officer's testimony.  Based upon the testimony presented at the hearings, the court determines that this issue, while of concern, has been resolved.

[2] Those three issues are as follows:

(1) Whether a temporal break between a prohibited search and a permissible search calls for the exclusion of all evidence discovered after the prohibited search.  If not, under what circumstances is the evidence not subject to the Exclusionary Rule?

(2) Whether a search that would have occurred regardless of an earlier, prohibited search is subject to the Exclusionary Rule.

(3) Whether, and if so how, the "good faith exception" to the Exclusionary Rule applies in this case.

(Doc. # 37).

vehicle on October 20, 2015.  No security cameras captured the circumstances surrounding the car's disappearance.

2.     Because the missing Escalade was equipped with an OnStar security system, a dealership employee contacted OnStar for assistance in locating the vehicle.  Upon learning that OnStar would only activate its service after the filing of a police report, dealership manager Preston Balthrop contacted the Vicksburg Police Department.  On November 3, 2015, at 3:36 p.m., Office Michelle Moore of the Vicksburg Police Department responded to the dealership, initiated a report on the stolen vehicle, and placed the vehicle on the NCIC.

3.     On November 3, 2015, at 5:20 p.m., an OnStar representative contacted Officer Moore and informed her that OnStar had (1) located the vehicle at a location in Pleasant Grove, Alabama, (2) disabled the vehicle and rendered it inoperable, and (3) tracked the vehicle for one-and-one-half hours and it had not moved.

4.     The OnStar representative also stated that OnStar had notified the Pleasant Grove Police Department of the stolen vehicle.

5.     Three Pleasant Grove Police Department officers were dispatched at approximately 5:41 p.m. to 413 4th Terrace, Pleasant Grove, Alabama 35217 after OnStar reported that a stolen cream-colored Cadillac Escalade's vehicle alert showed it to be located at that address.  When the officers arrived, they saw two cars in a carport outside the house at that address, but not the Escalade.

6.     Upon the officers' arrival, Officer Kendal Coker and Corporal Duane Martin looked through glass windows of the garage door and observed a vehicle fitting the description of the missing car.  Officer Coker did so by standing on a retaining wall next to the driveway, leaning slightly, and peering through the glass window.  Corporal Martin stood just outside the

garage door and looked inside the garage. The officers used a flashlight and observed inside the garage a vehicle fitting the description of the missing Escalade.

7.     Corporal Martin then walked from the driveway down the sidewalk leading to the front door.

8.     He knocked on the front door and identified himself as Pleasant Grove Police.

9.     After identifying himself, Corporal Martin heard someone say something he did not understand, and then heard what sounded like someone running through the residence. Officer Coker also heard speaking and running.

10.    Based on these sounds and noises, the officers believed there to be more than one person in the house.

11.    Corporal Martin knocked again and identified himself as a Pleasant Grove Police Officer. Corporal Martin and Officer Coker unholstered their guns.

12.    During this time, Officer Samuel Powell was looking into a window on the north side of the residence. He could see into a kitchen and living room and saw a blur go by after the first knock. Also, Officer Powell heard loud steps running through the house. He could not tell how many people were inside the house.

13.    After a period of time (that is, more than thirty seconds, but less than a minute), Ratcliff opened the door. A strong smell of marijuana wafted from inside the house.

14.    Corporal Martin instructed Ratcliff to get on the ground, took hold of his arm, and guided him to the ground. Once Ratcliff was on the ground, partially inside and partially outside the house, Officer Coker holstered her gun. Officer Coker then placed Ratcliff in handcuffs.

15.    Subsequently, Corporal Martin and Officer Powell conducted a "protective sweep" of the residence. During that sweep, they observed a pill bottle without a label on a

4

nightstand.  When they swept the restroom, the officers also saw a small amount of what they suspected to be marijuana floating in the toilet.  In addition, they saw a gun sitting on the left side of the bed.

16.    Corporal Martin and Officer Powell then went to the attached garage and performed a "protective sweep."  They saw a vehicle matching OnStar's description of the missing Escalade, along with a Dodge Charger.  Officer Powell also ran the tag and the VIN of the Escalade and confirmed it was the suspected missing vehicle.  Then Officer Powell entered the Escalade and called OnStar.  He requested OnStar to set off the Escalade's alarm.  The vehicle's alarm sounded.  After the sweep ended, Corporal Martin holstered his gun.

17.    Corporal Martin contacted Detective Andy Reed, a Narcotics Investigator with the Narcotics Investigations Task Force.

18.    At some point shortly after the time the officers entered the house, they asked about the marijuana smell.  Ratcliff replied that there was a dime bag in the kitchen.

19.    Detective Reed arrived at the house at approximately 6:30 to 6:40 p.m.  The front door was open and he could smell the odor of marijuana as he exited his vehicle.  Detective Reed was in plain clothes.

20.    After arriving, Detective Reed advised Ratcliff that Corporal Martin called him to the house regarding a possible narcotics complaint while the officers were following up on a report of a stolen car from OnStar.   Ratcliff was handcuffed at this time, sitting on his doorstep.

21.    Detective Reed and Ratcliff moved inside and sat on a couch.  Detective Reed told Ratcliff he was there because of the reeking smell of marijuana.  Ratcliff admitted that he flushed about an ounce down the toilet when the officers had arrived.  Detective Reed and Ratcliff had a friendly demeanor with each other.  Officer Coker was standing a little behind

Detective Reed and Ratcliff, and Officer Powell and Corporal Martin were in the foyer space. All of the officers' weapons were holstered.

22.     Detective Reed stated that, in light of the smell of marijuana, Ratcliff could either give permission for the officers to search the house, or Detective Reed can get a search warrant from a judge and the officers would thereafter search.  Ratcliff gave consent.  Again, Detective Reed reported that this portion of the conversation also had a friendly, casual demeanor.

23.     Detective Reed prepared a handwritten form authorizing officers to search the house.  He asked Ratcliff if he could read; Ratcliff said yes.  Detective Reed read the form out loud to Ratcliff, asked Ratcliff to read it too, and, if Ratcliff agreed, to sign it.  Then Detective Reed removed Ratcliff's handcuffs and told him to sign the form if he wanted to, but not to sign if he did not want to.   Ratcliff signed the form at 7:05 p.m.

24.      Ratcliff was not given (and had not previously been given) a *Miranda* warning at this or any earlier time.

25.     Detective Reed placed Ratcliff back in handcuffs and had Officer Coker sit with him on the couch.

26.     Detective Reed then performed a cursory walk-through of the house.  Proceeding down the hall, he looked in the hall bathroom, a first bedroom, a second bedroom, and then the master bedroom.  He saw nothing in the hall bathroom, a small safe in the first bedroom, and nothing in the second bedroom.  Detective Reed observed a pill bottle without a label on a nightstand in the master bedroom.  Inside the bottle he found multiple suspected hydrocodone pills.  In the attached master bedroom bathroom, Detective Reed observed still floating in the toilet several small leaves of what he suspected were marijuana.  Additionally, Detective Reed observed a large safe in the master bedroom closet.

27.     Detective Reed then asked Ratcliff a series of questions concerning the large safe's contents.   He also asked Ratcliff to open both the large safe and the smaller safe. Although Ratcliff told Detective Reed the combination for the smaller safe, Reed could not figure out how to open it.  Detective Reed asked if there were guns in the safe, and, after Ratcliff answered in the negative, unhandcuffed Ratcliff.   Ratcliff opened the safe for Detective Reed. Detective Reed observed large amounts of U.S. currency.   Ratcliff offered to pay Detective Reed half of the money if he would let him go.

28.     Thereafter, Chief Robert Knight and Lieutenant Daniel Reid arrived.  Detective Reed left.  The other officers escorted Ratcliff outside and secured the house.

29.     Detective Reed returned to his office to begin the process of obtaining a search warrant and prepared a sworn affidavit for a search warrant.

30.     At approximately 8:41 p.m. on November 3, 2015, Officer Powell transported Ratcliff to the Pleasant Grove Police Station.

31.     At 9:39 p.m., Jefferson County District Court Judge Eric Fancher signed and issued the search warrant.

32.     Detective Reed returned to Ratcliff's house with the signed search warrant. Sergeant Michael Shupe (Reed's partner), Lieutenant Reid, Chief Knight, Corporal Martin, and Officers Coker and Powell were all there.  They executed the search warrant from approximately 10:30 p.m. until 1:15 a.m. the next morning (November 4, 2015).  The officers recovered the following items: multiple opened and unopened boxes of sandwich baggies, one food vacuum sealer, six digital scales with white powder residue, two loaded Smith and Wesson .40 caliber semi-automatic handguns, one laded Mossberg 12 gauge pump action shotgun, multiple loaded magazines, multiple kilo wrappers with white powder residue, approximately $247,460 in cash,

the unmarked pill bottle with hydrocodone pills, and approximately 1.8 kilograms of suspected cocaine hydrochloride.  One pistol was found on the bed in the master bedroom; the other pistol and shotgun were under the couch in the living room.  The suspected cocaine hydrochloride was located in two locations: the basement and the living room.  The officers found no marijuana other than that floating in the toilet.

33.     Detective Reed and Sergeant Shupe conducted a videotaped interview with Ratcliff the morning of November 4, 2015.  After he signed a *Miranda* waiver, Ratcliff admitted to selling cocaine and marijuana as his primary means of support.

## II.    Analysis

Defendant seeks to suppress all evidence and statements obtained from what he contends was a warrantless search of his garage, a warrantless arrest of him in his home, an impermissible protective sweep, and an unlawful search and seizure of evidence from within his residence. (Doc. # 15).  He asserts that the evidence is due to be suppressed because the searches, protective sweep, and seizure of evidence violated his Fourth Amendment rights, and because the police officers elicited incriminating statements from him in violation of *Miranda*.  (*Id.* at p. 1). Further, Defendant contends that all evidence seized after the officers obtained a search warrant should be suppressed "because the warrant was based on unconstitutionally procured information." (*Id.*).  The court need not decide the latter question at this time because, even if the initial search of the garage violated the Fourth Amendment, and even if the officers violated *Miranda*, the evidence of unlawful activity they observed when Ratcliff opened the door to his home, the evidence in plain view which they saw during the protective sweep, and the evidence they uncovered during the consented-to search all provided a lawful basis for the warrant.  And, for the sake of argument, even assuming that the officers' initial entry and protective sweep were

8

unlawful (although, to be sure, the court finds they were lawful), the evidence they uncovered during the untainted consented-to search provided a lawful basis for the warrant.

### A.   Even If the Pre-Knock Observation of the Garage Was a Fourth Amendment Violation, the Evidence Recovered Post-Knock Is Not Due To Be Suppressed

Defendant contends that the officers' initial, pre-knock observation of his garage from the curtilage[3] of his home amounts to an unreasonable search and a violation of the Fourth Amendment.  To some limited extent, the court agrees.  But even if that is so, for the reasons explained below, the suppression remedy is not available with respect to the evidence ultimately recovered from Defendant after the knock.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).  "[T]he area 'immediately surrounding and associated with the home'—what [] cases call the curtilage—[is] 'part of the home itself for Fourth Amendment purposes.'"  *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984)).  "It is well-established that police officers can enter onto residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business."  *Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011) (*en banc*) (citation omitted).  However, "[w]hile law enforcement officers need not 'shield their eyes' when passing by the home 'on public thoroughfares,' an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas."  *Jardines*, 133 S. Ct. at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)).

---

[3] Actually, here, the two officers looked through Ratcliff's garage windows but in distinct manners. Corporal Martin simply stood directly outside the garage door and looked through the windows that were naturally accessible due to his height.  Officer Coker stood on a retaining wall, leaned over, and peered inside the garage windows.  The vision of both officers' was aided with a flashlight.

Neither the Supreme Court nor the Eleventh Circuit have settled the question of whether a police officer violates the Fourth Amendment when she peers through the windows of a closed garage door attached to a house.  It would press the imagination to consider Ratcliff's attached garage not part of the curtilage or subject to the Fourth Amendment's protections of the home. *See Jardines*, 133 S. Ct. at 1414-15.  Nevertheless, to be sure, the legality of the observations by Corporal Martin and Officer Coker from outside the garage is a difficult question.  *Compare Taylor v. United States*, 286 U.S. 1, 5-6 (1932) (finding a Fourth Amendment violation when officers, without a warrant, recovered whiskey from a closed and locked garage) *and United States v. Walker*, 799 F.3d 1361, 1364 (11th Cir. 2015) (finding officers did not violate the Fourth Amendment and exceed the geographic limit on the knock and talk exception when approaching the defendant in a vehicle in an open-sided carport) *with Coffin*, 642 F.3d at 1003, 1012-13 (finding, in 42 U.S.C. § 1983 case, it was a Fourth Amendment violation when officers, who did not possess a search or arrest warrant, entered the plaintiffs' attached open garage and arrested one plaintiff who had told the officers to leave and attempted to shut the garage door to keep them out).  As thorny as this issue is, the court is not required to decide the legality of the officers' looking into Defendant's garage.  This is the case because, even if the court assumes that their peek into the garage violated the Fourth Amendment, the evidence found during the *subsequent* searches is admissible as the result of the protective sweep, voluntary consent, and a warrant supported by probable cause.

**B.    The Knock and Announce Was a Distinct Event that Would Have Occurred Regardless of the Questionable Peek into Defendant's Garage Windows**

"The Fourth Amendment . . . is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403

U.S. 443, 466 (1971); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991)).   Stated

otherwise, "[o]fficers are allowed to knock on a residence's door or otherwise approach the

residence seeking to speak to the inhabitants just as any private citizen may."   *Id.* (quoting *Estate*

*of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003)); *see also Walker*, 799 F.3d at 1363-64

(knock and talk exception to Fourth Amendment allows an officers just to seek with a person in a

home, regardless of whether they know if that person is currently present).   A police officer is

allowed to conduct a knock and talk without a warrant "precisely because that is no more than

any private citizen may do."   *Jardine*, 133 S. Ct. at 1416.

In this case, the officers initially arrived at Ratcliff's property to conduct a knock and

talk.   That was both reasonable and permissible.   They had received a report from OnStar

concerning the stolen Escalade being at that house.   While on the way to the front door two of

the officers detoured to look through the garage windows, but they quickly were back on the path

to the front door to initiate the knock and talk.   The court finds the knock and talk clearly was a

permissible police activity and would have occurred regardless of the preceding action by the

police officers of looking into the garage.

Moreover, based on these facts, the court determines that, if the observations through the

garage windows were an unreasonable search, three exceptions to the Exclusionary Rule apply.

These exceptions include the independent source doctrine, the inevitable discovery doctrine, and

the attenuation doctrine.   "The independent source doctrine allows admission of evidence that

has been discovered by means wholly independent of any constitutional violation."   *Nix v.*

*Williams*, 467 U.S. 431, 443 (1984).   Separately, but relatedly, under the inevitable discovery

doctrine "[i]f the prosecution can establish by a preponderance of the evidence that the

information ultimately or inevitably would have been discovered by lawful means . . . then the

11

deterrence rational [of the Exclusionary Rule] has so little basis that the evidence should be received." *Id.* at 444.  And, under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016) (quoting *Hudson v. Mich.*, 547 U.S. 586, 593 (2006)).   Three factors guide the application of the attenuation doctrine: (1) the "temporal proximity" between the unconstitutional conduct and the discovery of evidence, (2) the "presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 2061-62 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)).

Here, the knock and talk is a significant event.  This is because the discovery of the evidence found in Ratcliff's house and sought to be suppressed stemmed directly from the knock and talk. Thus, the knock and talk is the key activity that triggers the application of the three exceptions to the Exclusionary Rule noted above.

First, the officers arrived at Ratcliff's house due to an independent source—the OnStar report, which indicated the presence of a stolen vehicle at the property.  Under the circumstances, it was reasonable for the officers to conduct a knock and talk.[4]  When they did so, they were confronted with the house's occupant, Ratcliff.[5]  Second, although the knock and talk (and subsequent takedown and protective sweep) occurred "only minutes" after the observations through the garage windows, *Strieff*, 136 S. Ct. at 2062, it is nevertheless important that (1) the knock and talk (and subsequent protective sweep and consented-to search) was an intervening

---

[4] To be sure, at the time the officers conducted the knock and talk, they were unaware of the actual number of current occupants of the house.

[5] The Government proved these (and other significant) facts by a preponderance of the evidence at the hearings.

circumstance, and (2) the officers' looking through the garage windows was not "purposeful or flagrant"—it "was at most negligent." *Id.* at 2063. Thus, despite the temporal proximity between the two events, the facts weigh in favor of the Government's position here. The court concludes the knock and talk (and, subsequently, observed certain evidence which was in plain view during their sweep) was sufficiently attenuated from the officers' observations through the garage windows.

Accordingly, even if Corporal Martin and Officer Coker's peek into Ratcliff's garage constituted an unreasonable search, that peek was ultimately irrelevant to the evidence being discovered. That is, even if the officers had not seen the car inside the garage, they still would have performed the permissible knock and talk, which is what led to the recovered evidence that is challenged here.

### C. After the Officers' Knock, and After a Delay, Ratcliff Voluntarily Opened His Front Door

When the officer first knocked at Ratcliff's door, he did not answer. After the second knock, he opened his door. The court must determine whether Ratcliff voluntarily opened his front door. On this question, the Government must establish that he voluntarily opened the door of his own free will and not in response to a show of official authority. *United States v. Smalls*, 617 F. Supp. 2d 1240, 1253 (S.D. Fla. 2008) (citing cases). This assessment must be made in light of the totality of the circumstances. *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (*en banc*) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). If the circumstances indicate that Ratcliff opened the door in response to a "show of official authority," then he cannot be deemed to have voluntarily opened his door. *Id.* (quoting *United States v. Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986)).

Here, three officers were at the scene, but only two were at Ratcliff's door.  Though they were uniformed and armed, at the time of their first knock their guns were holstered.  After the officers heard talking from inside the house and heard and observed someone running through the house, they unholstered their weapons.  They knocked again after a time period passed that was more than thirty seconds, but less than a minute. There is no evidence that the officers ordered Ratcliff to open the door, and no evidence that he saw the officers' drawn weapons.[6] Under the totality of circumstances, the court finds Ratcliff opened the door voluntarily, not in response to a show of authority.

### D.     Even Assuming Ratcliff Was Arrested When He Was Placed in Handcuffs, that Arrest Was Supported by Probable Cause

After Ratcliff opened his front door, a strong scent of marijuana wafted from the house. The officers directed him to the ground and placed him in handcuffs.  Ratcliff contends that the officers arrested him either without probable cause or because they had viewed the Escalade in his garage.  The court disagrees.  Even assuming that initially placing Ratcliff in handcuffs was an arrest (and the court so assumes), the officers had probable cause to do so because of his suspicious behavior <u>and</u> the reeking marijuana smell they encountered when the door opened.

A suspect is "under arrest" once he is taken into custody or otherwise deprived of his freedom of action in any significant way.  *See Henry v. United States*, 361 U.S. 98, 103 (1959). Of course, a police officer may arrest an individual only upon a showing of probable cause. *United States v. Acosta*, 363 F.3d 1145-46 (11th Cir. 2004).  "The question of what amounts to 'probable cause is purely a question of law.'"  *Tobin*, 923 F.2d at 1510 (quoting *United States v.*

---

[6] There was evidence presented at the hearings that when the officers initially knocked they did not have their weapons drawn.  They did have their weapons drawn when Ratcliff answered the door.  But, under the circumstances, it was reasonable for the officers to have done so.  The police officers had previously observed two cars in the carport, heard talking inside the house after the first knock, and heard and observed running in the house. Although they may have only heard one voice, and Officer Powell may have seen only one person running inside the kitchen of the house through the kitchen window, it is not unreasonable for the officers in such a situation to be concerned for their safety.  For all they knew, there could have been multiple persons in the house.

*Hurtado*, 779 F.2d 1467, 1477 (11th Cir. 1985)).   "Probable cause exists when under the 'totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"   *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)) (changes in *Tobin*).   Stated otherwise, probable cause exists "where the facts lead a reasonably cautious person to believe the 'search will uncover evidence of a crime.'"   *Id.* (quoting *United States v. Burgos*, 720 F.2d 1520, 1525 (11th Cir. 1983) (other citation omitted).   Probable cause "does not demand any showing that such a belief [that contraband or evidence of a crime may be present] be correct or more likely true than false.   A practical, nontechnical probability that incriminating evidence is involved is all that is required."   *Texas v. Brown*, 460 U.S. 730, 742 (1983) (quotations and citations omitted).

Further, "[e]xigent circumstances must exist for the warrantless arrest of a suspect." *United States v. Forker*, 928 F.2d 365, 369 (11th Cir. 1991) (citation omitted).   "These conditions include hot pursuit of a suspect, danger to an arresting officer or to the public, and the risk of removal or destruction of evidence."   *Id.* at 370 (citation omitted); *see also Minnesota v. Olson*, 495 U.S. 91, 100 (1990) ("A warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." (citations and internal quotations omitted)).   The Eleventh Circuit "has held that the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so easily and quickly destroyed."   *Forker*, 928 F.2d at 369 (quoting *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990)).   "The test of whether exigent circumstances exist is an objective one."   *Tobin*, 923 F.2d at 1510 (citing *Young*, 90 F.2d

at 446).  The conduct of the police must be reasonable preceding the exigency and must not have created the exigency.  *See Kentucky v. King*, 563 U.S. 452, 462 (2011).

### 1.      The Police Officers Had Probable Cause to Arrest Ratcliff

The court determines the police officers had a legal basis to handcuff Ratcliff, regardless of their observations into the garage.  First, OnStar had alerted them to the presence of the Escalade at Ratcliff's address.  Admittedly, that knowledge alone only would have given rise to a reasonable suspicion, not probable cause.  But there is more.  After their knock on the door, the officers heard and observed unusual activity from within the house.  At first, there was no answer.  The officers then heard talking (they could not determine how many voices).  They also saw someone move quickly past a window (*i.e.*, a blur of a person).  And when Ratcliff finally opened the door, a strong odor of marijuana came from the house.  The suspicious behavior and the presence of that odor indicated a "fair probability that contraband or evidence of a crime [would] be found in" Ratcliff's house.  *Tobin*, 923 F.2d at 1510 (quoting *Gates*, 462 U.S. at 238).  Thus, the court determines that the totality of these circumstances demonstrates the existence of probable cause for an arrest.

### 2.      The Officers Did Not Violate the Fourth Amendment When They Made a Warrantless Arrest to Prevent the Destruction of Evidence

After careful review, the court also concludes that exigent circumstances existed that justified the officer's arrest of Ratcliff.  As already noted, the officers did not know how many people were present in Ratcliff's house.  They saw multiple cars in the carport and heard running when they first knocked.  The officers reasonably feared others were in the house.  Additionally, because of the running noises and the smell of marijuana, there was a reasonable risk of the

destruction or removal of narcotics evidence.[7]   Although "[c]ircumstances are not normally considered exigent where the suspects are unaware of police surveillance," here, the police officers "could reasonably conclude from [Ratcliff's] hurried actions" that he was "either aware or afraid that someone was watching" him. *Tobin*, 923 F.2d at 1510.  And, the officers did not create any exigency.  They simply went to Ratcliff's front door for a knock and talk, and the exigencies arose from there.

The Eleventh Circuit's decision in *Tobin* is on point.  There, the district court found that three law enforcement agents had obtained reasonable suspicion of illicit activity after observing questionable behavior by two individuals in a driveway at a house.  923 F.2d at 1508, 1510.  The agents approached the house after those individuals entered it, and one agent went to the door to perform a knock and talk.  *Id.* at 1508.  After there was no answer, that agent continued knocking until someone answered.  *Id.*  The agent smelled marijuana coming from inside the house.  *Id.*  "Probable cause, in the district court's view, did not arise until the agent, while standing at the door, smelled the marijuana."  *Id.* at 1510.  To the contrary, the Eleventh Circuit found that probable cause arose "[p]rior to [the officers'] approach to the house, [when] the agents observed the defendants behave suspiciously, look about furtively, and quickly transfer into the garage tubular bags, which contained smaller bundles."  *Id.*

In this case, although the court does not find that the police officers had probable cause prior to approaching Ratcliff's house, probable cause arose when the officers heard and observed suspicious activity in the house <u>and</u> when Corporal Martin, "while standing at the door, smelled the marijuana."  *Tobin*, 923 F.2d at 1510.  "There is no doubt that the [Corporal Martin]'s suspicions rose to the level of probable cause when, as the door stood open, he detected what he

---

[7] Three officers were present and their patrol cars blocked the driveway, but there was still a risk that Ratcliff could have run away if they had not placed him in handcuffs.

knew from his law enforcement experience to be the odor of marijuana." *Id.* at 1512 (citing *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982)). "Moreover, [Ratcliff] and anyone else who might have been present in the house would have been aware of the [officer]'s suspicions at that moment." *Id.* The possible threat to the officers' safety and the "[d]anger that [Ratcliff] or someone else inside the house might destroy the evidence thus provided the exigent circumstances required to justify a warrantless" arrest.[8] *Id.*

The court determines that the handcuffing of Ratcliff, whether as part of officer protection, based on exigent circumstances, or incident to an arrest, was, at the point it occurred, permissible.

### E.      The Initial Search Was Permissible Under the Fourth Amendment

Subsequent to placing Ratcliff in handcuffs, Corporal Martin and Officer Powell performed a "protective sweep" of the house. After careful review, and in light of the totality of the circumstances, the court determines this protective sweep was permissible. However, even if Ratcliff was not yet already (validly) under arrest, the search was permissible as one conducted under exigent circumstances.

### 1.      The Protective Sweep Was Permissible

A protective sweep "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Delancy*,

---

[8] Also, to be sure, this is not a case where the officers arrested Ratcliff inside his house, or pulled him out. The evidence presented at the suppression hearing shows that Ratcliff, when cuffed, was partially inside and partially outside his house in a supine position with the door open. He "was not in an area where []he had any expectation of privacy." *United States v. Santana*, 427 U.S. 38, 42 (1976). Ratcliff was supine in the threshold of his house, which is, for Fourth Amendment purposes, a "public" place. *See id.* "[T]he warrantless arrest of an individual in a public place upon probable cause d[oes] not violate the Fourth Amendment." *Id.* (citation omitted). But even if *Santana* were distinguishable on the facts of this case and the officers proceeded beyond the "firm line" of Ratcliff's threshold, the exigent circumstances present here justified that entry. *See McClish v. Nugent*, 483 F.3d 1231, 1240-48 (11th Cir. 2007).

502 F.3d 1297, 1306 (11th Cir. 2007) (quoting *Maryland v. Buie*, 494 U.S. 325, 327 (1990)). "Officers have a legitimate interest 'in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack.'" *United States v. Hromada*, 49 F.3d 685, 690 (11th Cir. 1995) (quoting *Buie*, 494 U.S. at 333). Further, "[o]fficers may seize an object they discovery in plain view during a proper protective sweep if they have probable cause to believe the object is contraband." *United States v. Jackson*, 618 Fed. Appx. 472, 476 (11th Cir. 2015) (*per curiam*) (citations omitted).

Even assuming that when the officers initially handcuffed Ratcliff they placed him under arrest, they were entitled to conduct the protective sweep of the house and attached garage. Again, the officers saw multiple cars outside the house when they arrived, and heard running and talking inside the house prior to Ratcliff opening his door. They had a legitimate interest in protecting their safety by assuring themselves that no one else was hiding in the house or garage with a weapon or other means to attack the officers.

During the protective sweep, the officers saw in plain view the pill bottle, the marijuana in the toilet, the gun on the bed, and the Escalade in the garage. Although the officers may have lingered too long in the garage with the Escalade (when they confirmed it was indeed the vehicle about which OnStar had altered law enforcement), notably, the officers did not at that time seize any of the items that they saw.

### 2. Even if Ratcliff Was Not Yet Validly Under Arrest, Exigent Circumstances Allowed the Officer to Conduct a Brief Search

Even if Ratcliff was not actually (and/or validly) under arrest when he was handcuffed, the officers' quick, initial walk through the house was allowed not only as part of a protective sweep, but also due to exigent circumstances. Exigent circumstances, when coupled with

19

probable cause, also allow for a warrantless search of a home.  *See Tobin*, 923 F.2d at 1510.  "An exigent situation may arise . . . when there is danger that the evidence will be destroyed or removed."  *Id.* (citation omitted).  "[T]he need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so easily and quickly destroyed."  *Forker*, 928 F.2d at 369.  In addition, "[a] warrantless intrusion may be justified by hot pursuit of a fleeing felon, . . . or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling."  *Olson*, 495 U.S. at 100.

Again, as the court has determined above, the officers had probable cause to believe "that contraband or evidence of a crime [would] be found in" Ratcliff's house.  *Tobin*, 923 F.2d at 1510 (citations omitted).  When Ratcliff opened the door, a strong odor of marijuana was emitted from his house.  The officers were unaware how many people were in the house.  After the knock and during the delay in opening the door, there was talking and movement in the house.  As soon as they smelled the marijuana, the situation evolved from officers seeking more information about the OnStar report to officers confronted with suspicious behavior and evidence of a narcotics crime.  Under all of these facts, exigent circumstances plainly existed.  The officers had a need to attempt to prevent the destruction of evidence (marijuana).  Moreover, as they testified, they were also concerned with the safety of the officers outside the dwelling.  During the sweep, they were able to satisfy themselves that there was no further danger to the officers, and that no one else was present who could destroy any further evidence.  And during the exigent circumstances search, the officers were not required to shield their eyes from objects in plain view.

**F.      Ratcliff's Consent to Search Was Given Voluntarily and Not Tainted**

After careful review, the court concludes that the evidence found during the *subsequent* search of the house was admissible as the result of Ratcliff's voluntary consent to a search of the house, even if the prior police activity was unlawful (although, to be sure, the court concludes that it was lawful).  The court has undertaken the "mandatory" two-step analysis set forth by the Eleventh Circuit in *Delancy*.  502 F.3d at 1308.  "First, a court must determine whether a search was voluntary."  *Id.*  "Second, the court must determine whether the consent, even if voluntary, requires exclusion of the evidence found during the search because it was the 'fruit of the poisonous tree'—the product of an illegal entry."  *Id.* (citing *United States v. Santa*, 236 F.3d 662, 676-77 (11th Cir. 2000)).  This "second requirement focuses on causation: 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'"  *Santa*, 236 F.3d at 676-77 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)).  The court addresses these elements, in turn.

**1.      Ratcliff's Consent to Search Was Voluntarily Given**

"Consent to search must be voluntarily given, but need not be knowing and intelligent." *United States v. Jennings*, 491 F. Supp. 2d 1072, 1078-79 (M.D. Ala. 2007) (citing *Bustamonte*, 412 U.S. at 235).  The question of whether consent was voluntary is measured from a totality of the circumstances.   *United States v. Garcia* 890 F.2d 355, 358 (11th Cir. 1989) (citing *Bustamonte*, 412 U.S. at 248-49).   Proof of knowledge of the right to refuse consent is not required.  *Bustamonte*, 412 U.S. at 232-33.  In evaluating voluntariness under the totality of the circumstances, the court considers "evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a person of his rights; and the voluntariness of any statement

taken under those conditions has been carefully scrutinized to determine whether it was in fact voluntarily given." *Id.* at 248. "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing voluntary consent." *Id.* at 249. Moreover, "[i]n order for consent to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Garcia*, 890 F.2d at 360 (citation omitted).

Evidence of the circumstances under which the police officers elicited Ratcliff's consent was introduced solely by the Government through its witnesses. Based on that evidence, and under the totality of the circumstances, the court determines Ratcliff voluntarily gave his consent.

This case is similar to *Garcia*. There, after fourteen agents arrested the defendant and conducted a protective sweep, the defendant was led inside and placed on a couch in his living room. 890 F.2d at 360. He was given *Miranda* warnings, *id.*, and was handcuffed. *Id.* at 362. One officer requested a verbal consent to search, but the defendant consented to only a limited search. *Id.* at 361. The agents declined to accept partial consent, and told the defendant if he did not consent to a search of the entire premises they would secure the house and apply for a search warrant. *Id.* The defendant then consented to a search of the entire house. *Id.* The district court found that, under these circumstances, the defendant was coerced and did not voluntarily give consent to search. But the Eleventh Circuit disagreed and reversed, finding that consent was valid. *Id.* at 361-63.

In this case, the circumstances were not nearly as problematic as those in *Garcia*. To be sure, Ratcliff was not given *Miranda* warnings, but "the fact that [he] may not have been given

*Miranda* warnings prior to giving his consent does not invalidate the consent." *United States v. Villanueva-Fabela*, 202 Fed. Appx. 421, 427 (11th Cir. 2006) (*per curiam*) ("This court has previously explained that a consent to search is not a self-incriminating statement, and therefore, that a defendant's consent can be valid even if it was obtained after he had been given *Miranda* warnings and had invoked his right to remain silent." (citation omitted)).  Also, Ratcliff was handcuffed, but once Detective Reed arrived he was taken to the living room couch by the officers.  All weapons were (and had been) holstered since the time the officers placed Ratcliff in handcuffs (which was an hour beforehand).  Although four officers were present, only two were in the living room.

Detective Reed testified that he had a conversation with Ratcliff that was conducted in a "friendly" tone.  (Doc. # 34 at p. 243).  He explained to Ratcliff why he was at the house and asked for consent to search the house.  (*Id.* at p. 244).  He also told Ratcliff that if he did not consent, he would apply for a search warrant.  (*Id.*).  Ratcliff verbally responded and said he would give consent.  (*Id.*).

Upon Ratcliff's verbal indication of consent, Detective Reed then prepared and read aloud a handwritten form acknowledging consent, and gave it to Ratcliff.  (*Id.* at pp. 244-46).  He asked Ratcliff if he could read it, and when Ratcliff acknowledged he could, the officers unhandcuffed him.  (*Id.* at pp. 246-47).  Ratcliff then looked at the form, and signed it.  (*Id.* at p. 247).

Even if "these factors indicate that [Ratcliff] was under some pressure to comply with the [officers'] request, [] considering the totality of the circumstances, [the court] cannot conclude that these factors caused [Ratcliff]'s consent to become involuntary."  *Garcia*, 890 F.2d at 362; *see also Villanueva-Fabela*, 202 Fed. Appx. at 427 (consent found to be voluntary when officers

in full uniforms, did not have weapons drawn, defendant was placed in handcuffs, police stated they would obtain warrant if consent not given, and defendant gave verbal and written consent). Accordingly, the court determines that Ratcliff voluntarily consented to a search of his house. Thus, the court undertakes the second step of the *Delancy* analysis.

### 2.      Ratcliff's Consent Was Not Tainted by Prior Police Activity

The second part of the *Delancy* test requires the court to consider whether the officers' prior (*arguendo*) illegal entry and handcuffing tainted Ratcliff's consent so that evidence found *after* the consent should be excluded. *Delancy*, 502 F.3d at 1309. The "apt question . . . is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488. The court is "obliged to determine whether the consent was 'sufficiently an act of free will to purge the primary taint of the unlawful invasion,' or, alternatively, whether the causal connection had 'become so attenuated as to dissipate the taint.'" *Delancy*, 502 F.3d at 1309 (quoting *Wong Sun*, 371 U.S. at 486-87). "This is a fact-specific question, and no single fact is dispositive." *Id.* (citing *Brown*, 422 U.S. at 603).

The Eleventh Circuit has set forth three factors that courts should apply in making this determination: "(1) the temporal proximity of the seizure and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *Delancy*, 502 F.3d at 1309 (quoting *Santa*, 236 F.3d at 677). Of course, these three factors (which mirror the factors in the attenuation doctrine) are not exhaustive. *Id.* at 1310 (citing other possible factors). While they provide a useful structure, application of a factor-based analysis should not "obscure the underlying question, which 'generally involves a

pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response.'" *Id.* (quoting *United States v. Bailey*, 691 F.2d 1009, 1013 (11th Cir. 1982)).

### a.        Temporal Proximity

"The time elapsed between the illegal act and a subject's consent to search is obviously relevant." *Delancy*, 502 F.3d at 1310.  If only a short period of time has passed, a court is more likely to consider the consent to be tainted.  *Id.*  However, there is no definitive period of time required before consent *per se* is not tainted.  In cases where the temporal proximity was almost immediately following the illegal acts to fewer than five minutes, courts have found consent (or other statements made by the defendant) to be tainted.  *See, e.g.*, *Wong Sun*, 371 U.S. at 486 ("almost immediately" given statements tainted by illegal entry and arrest); *Santa*, 236 F.3d at 666-67, 678 (consent to search given just two to three minutes, which was no "significant lapse of time," after illegal forced entry into home by police); *United States v. Chanthasouxat*, 342 F.3d 1271, 1280 (11th Cir. 2003) ("extremely close temporal proximity" of three minutes between illegal stop and consent to search van too close).  Binding precedent makes clear that short temporal proximity alone, so long as that proximity is not "almost immediate[]," *Wong Sun*, 371 U.S. at 486, does not indicate tainted consent.  *See, e.g.*, *Strieff*, 136 S. Ct. at 2062 ("only minutes" passage of time, coupled with other factors, did not call for suppression); *Delancy*, 502 F.3d at 1310-11 (between ten and twenty minutes of time was "relatively brief" but, in the presence of other factors, not tainting).

Here, although the exact amount of time is not clear, the evidence shows that somewhere between thirty minutes and an hour elapsed between (1) the time the officers entered the house, handcuffed Ratcliff, and conducted the "protective sweep," and (2) the time that Ratcliff gave consent.  That time period may not mirror those found permissible in other cases.  Nevertheless,

the court is "also mindful of the specific facts of this case." *Delancy*, 502 F.3d at 1311.  To be clear, although Ratcliff was handcuffed, and the officers were already aware of one gun in the house, unlike in *Delancy*, the officers in this case had not searched inside the couch, so they had no knowledge whether another gun may be hidden there.  *Cf. id.* at 1301, 1305 (officers impermissibly uncovered gun in couch after protective sweep prior to placing defendant on couch and before obtaining valid consent from individual not in handcuffs).  No officers had their weapons drawn.  When Detective Reed arrived, he sat on the couch beside Ratcliff.  *See Garcia*, 890 F.2d at 361 ("We submit that one would feel more comfortable and free from pressure when he is in his living room than when he is lying in the grass on the edge of the street.").  And, again, "the interaction [between Detective Reed and Ratcliff] was conversational in tone, and [] the officers did not threaten [Ratcliff] in any way."  *Delancy*, 502 F.3d at 1311.  "In other words, the character of this interaction between the police and the person who consented stands in sharp contrast to cases like *Santa*.  Had the officers aimed their guns at [Ratcliff], [or] threatened [him], . . . the passage of time may have been more important in the calculus."  *Id.*  On these facts, "timing is not the most important factor," and Ratcliff's voluntary consent is not tainted due to the passage of time between the officers handcuffing him and obtaining his consent.  *Id.*

### b.       Intervening Circumstances

The second factor is the presence of intervening circumstances—that is, "events that interrupt the causal connection between the illegal act and the possibly tainted consent or confession."  *Delancy*, 502 F.3d at 1311 (citations omitted).  "The facts of this case suggest an important intervening circumstance: [Ratcliff]'s review and signing of the consent form."  *Id.*  Although the form did not unambiguously inform Ratcliff that he had a right to refuse to give

consent or expressly state any of his constitutional rights, the form twice expressly mentioned the word "illegal," and the phrase "permission under my own free will." (Govt Ex. No. 7). The fact that the form stated Ratcliff was giving written consent for officers to search for evidence of "illegal" activity was sufficient to put Ratcliff on notice of possible legal repercussions of the search. Ratcliff contends that the language of the written consent form does favor the Government's consent argument, and a prewritten form would have been better to present to Ratcliff. But, the fact that any written and signed form was used instead of the officers relying only on verbal consent is important. It suggests that Detective Reed acted in good faith. While this factor alone is not dispositive, it supports the Government's argument that the causal connection between the entry and the consent was "so attenuated as to dissipate the taint." *Wong Sun*, 371 U.S. at 487.

### c.    Purpose and Flagrance of Government Conduct

The third and final factor is the purpose and flagrance of the police officers' conduct. "This factor is also the most straightforward, and here, the most important one." *Delancy*, 502 F.3d at 1312. "If the police entry had been made for the purpose of gaining consent to conduct a full-scale search, [the court] would be bound to find the consent tainted. Indeed, when the police act with the express purpose of exploiting an illegal action, the causation is so obvious that no real attenuation analysis is even necessary." *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 404 (1983) (opinion of White, J.)). But that is not the case here.

The police's purpose in visiting Ratcliff's home was not to give the authorities a colorable reason to search his home for narcotics and related paraphernalia indicative of drug crimes. Rather, the officers sought to interview Ratcliff concerning the OnStar report indicating that the missing Escalade was at the house. Again, the situation changed when the officers, upon

27

knocking on the door, became suspicious after hearing talking and someone running through the house. They had already observed a number of cars at the house (even excluding the Escalade). Then, when the door finally opened, they smelled a strong odor of marijuana. Although the officers placed Ratcliff in handcuffs and entered the house, they entered to ensure their own safety and/or based upon exigent circumstances, not to conduct a thoroughgoing search. Even assuming for purposes of this discussion that the entry was unlawful, "the police did not enter *for an unlawful purpose*. The distinction is critical." *Delancy*, 502 F.3d at 1312; *see also Strieff*, 136 S. Ct. at 2063 (determining that the officer "was at most negligent. In stopping Strieff, Officer Fackrell made two good-faith mistakes. . . . His conduct thereafter was lawful.").

Similarly, the officer's conduct was not flagrant. Even if "it turned out [that] the police did not need to enter the house, weapons drawn[,] . . . such is the benefit of hindsight." *Delancy*, 502 F.3d at 1312. Again, the officers reasonably were concerned that more than one person was present at Ratcliff's house, and the officers were entitled to be cautious for their own protection. Apart from that concern, they were confronted with obvious criminal activity (narcotics use) after already being aware of suspicious behavior inside the house before Ratcliff came to the door. As soon as Ratcliff was in handcuffs, they holstered their weapons and did not remove them again. And while they remained with Ratcliff after the protective sweep, they never threatened him. The court concludes (even putting aside the issue of exigent circumstances) that because "the officers entered the house out of genuine and legitimate concern for their safety, their actions, even if unlawful, were not flagrantly so." *Delancy*, 502 F.3d at 1312.

Similarly, the officers did not act flagrantly during the protective sweep inside the house. They did not tear the house apart looking for drugs, attempt to open safes, look in drawers, or

gaze under furniture in search of weapons, contraband, or drug paraphernalia.  To be sure, the court understands that the officers did linger and play with the Escalade's OnStar features longer than they should have.  But, even that action, "while outside the scope of a protective sweep, was far from a flagrant violation of the law."  *Delancy*, 502 F.3d at 1313.  It "may have been a mistake, but surely there is no way to characterize it as flagrant."  *Id.*

Perhaps most importantly, there is no suggestion that the police exploited evidence found prior to consent.  Ratcliff argues that "[b]ased on information obtained during th[e protective sweep], officers brought in the drug task force."  (Doc. # 15 at p. 13).  Although the officers called Detective Reed to the house after the protective sweep, the smell of marijuana was undeniably present from the moment Ratcliff opened the door.  The officers each testified to the strength of that smell, and therefore it was not be unreasonable for the drug task force to be called regardless of the conduct of the protective sweep.  Further, and in any event, Detective Reed did not use the evidence of the gun, the pill bottle, or the suspected marijuana floating in the toilet to gain consent.  Rather, he testified that he told Ratcliff that he was present because the house reeked of marijuana.  "The very fact that the officers did not exploit the evidence found in plain view during the sweep . . . or prior to consent . . . is important evidence that they did not act in flagrant disregard of [Ratcliff]'s rights."  *Delancy*, 502 F.3d at 1313.

Taking all three factors together, along with the other facts of this case, and evaluating them as a whole, the court concludes that even if the officers' entry into the house could be deemed arguably illegal (and, to be clear, the court reaches the exact opposite conclusion here), that did not taint Ratcliff's consent.  Importantly, the Supreme Court has directed courts "not to apply the Exclusionary Rule 'indiscriminately,' but rather only when its 'remedial objectives are thought most efficaciously served.'"  *Delancy*, 502 F.3d at 1314 (quoting *Hudson v. Michigan*,

547 U.S. 586, 126 S. Ct. 2159, 2163 (2006)).  Therefore, this court finds the Exclusionary Rule does not apply here, and the evidence uncovered during the consented-to search of Ratcliff's house is not due to be suppressed.

### G.   The Search Warrant Is Validly Supported

Ratcliff further argues that the physical evidence seized upon execution of the search warrant must be suppressed because the warrant was based on information derived from prior illegal police activity.  That argument misses the mark.

"The Fourth Amendment states unambiguously that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (citing U.S. Const., amend. IV) (emphasis omitted).  The Supreme Court has thus directed courts and law enforcement that an affidavit must provide a judge who issues search warrants with a substantial basis for determining the existence of probable cause. *Illinois v. Gates*, 462 U.S. 213, 240 (1983).  "Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (citation omitted).  "The information in the affidavit must also be fresh." *Id.* (citation omitted).  To be sure, the inclusion of information obtained in violation of the Fourth Amendment in a warrant affidavit "invalidate[s] the warrant for the search of [a] house if it proved to be critical to establishing probable cause for the issuance of the warrant." *United States v. Karo*, 468 U.S. 705, 719 (1984).  "However, if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid." *Id.* (citation omitted).

After careful review, the court finds that the search warrant issued here complied with the

four requirements set forth in the Fourth Amendment, and Detective Reed's affidavit conformed to the directives of binding precedent.  (*See* Govt Ex. No. 8).   Moreover, the affidavit is supported by sufficient untainted evidence to establish probable cause.  In his affidavit, Detective Reed discussed (1) his background and experience, including the knowledge he has concerning narcotics crimes gained from training and experience, (2) a narrative of the events supporting his belief that probable cause existed, (3) a description of the residence to be searched, and (4) a particular description of the items to be seized.  (*Id.*).

The narrative of events supporting probable cause is the portion of the affidavit challenged by Ratcliff.  That narrative sets forth, in summary, as follows: (1) the date the police officers received a call from OnStar concerning a stolen vehicle at Ratcliff's address; (2) the visual observance of the vehicle by the officers upon their arrival at the house; (3) the first knock on the door and the officers' observations thereafter; (4) the second knock and the officers announcing themselves; (4) Ratcliff opening the door and the strong odor of marijuana emanating from inside the house; (4) a statement made by Ratcliff; (5) Detective Reed's arrival and conversation with Ratcliff, including the spontaneous statements made by Ratcliff; (6) the request for consent to search and Ratcliff's granting of consent; and (7) Detective Reed's observations of the pill bottle containing Hydrocodone, baggies with white residue, digital scales, and the remnants of marijuana in the toilet.  (Govt Ex. No. 8).  Notably, the warrant does not discuss the protective sweep, or exigent circumstances, or any arrest or handcuffing of Ratcliff.  Even if certain of the supporting statements are omitted due to the issue of taint (*i.e.*, the peek into the garage and sighting of the Escalade and, as discussed below, certain statements made by Ratcliff), there was enough untainted evidence included in the affidavit (the knock and announce, the suspicious behavior in the house, the reeking smell of marijuana, the consent

31

search, and Detective Reed's discoveries during that consent search) to justify a warrant. That is, the court finds that the affidavit contains sufficient untainted evidence to establish probable cause, and thus the search warrant was validly issued.

### H.   Some of the Statements Ratcliff Made without a *Miranda* Warning Are Due To Be Suppressed, But One Is Admissible

The court has ruled on the motion to suppress physical evidence, but the court's analysis does not end there. Ratcliff has also moved to suppress any statements he made in his house because he was never given a *Miranda* warning.

Unlike the events and evidence discussed thus far, which concern Ratcliff's Fourth Amendment protections, a *Miranda* warning acts as a safeguard to Fifth Amendment rights. *See Brown*, 422 U.S. at 601 (observing that "exclusion of a confession made without *Miranda* warnings might be regarded as necessary to effectuate the Fifth Amendment"); *see also Rhode Island v. Innis*, 446 U.S. 291, 297 (1980) ("[C]ertain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination."). To comply with *Miranda*, officers must, prior to conducting a custodial interrogation, inform a suspect that (1) he has the right to remain silent, (2) that statements may be used again against him, (3) that the suspect has the right to the presence of an attorney during questioning, and (4) that if the defendant cannot afford an attorney, one will be appointed. *Miranda v. Arizona*, 385 U.S. 436, 444-45 (1966). The Supreme Court has held that

> *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Innis*, 446 U.S. at 300-01.  The "failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 609 (2004).

Here, there are four series of statements at issue: (1) one that was elicited shortly after the officers entered the house concerning a dime bag of marijuana, (2) another that Ratcliff made to Detective Reed when Reed stated the house reeked of marijuana, (3) the responses to Detective Reed's questions about the contents of the safes, and (4) Ratcliff's offer of half the cash to Detective Reed.  The court need not make a detailed analysis of the "dime bag" statement, because the evidence shows Ratcliff made that statement in response to a question.  (Doc. # 25 at p. 111 (Corporal Martin: "we asked about the marijuana smell. . . . He replied that there was some marijuana in the kitchen.").  It also is clear that Ratcliff was handcuffed from almost the moment he opened the door.  Clearly, the "dime bag" statement was elicited as a response to custodial questioning, and is due to be suppressed.

When the other statements are viewed in the light most favorable to the Government, they appear to have been spontaneously uttered to Detective Reed.  Accordingly, the court must determine whether Detective Reed subjected Ratcliff to the functional equivalent of custodial questioning.  "The test of whether a statement by the police 'was reasonably likely to elicit an incriminating response,' focuses on the perception of the subject."  *Smalls*, 617 F. Supp. 2d at 1261 (quoting *Innis*, 446 U.S. at 301).  The court first addresses Ratcliff's flushing statement, and second his answers concerning contents of the safes and offer of cash.

When Detective Reed sat on the couch with Ratcliff, he explained in a friendly demeanor that he was there because the house reeked of marijuana.  In substance, Ratcliff stated that he had flushed an ounce of marijuana down the toilet when the police came.  (Doc. # 34 at pp. 242-43).

Although the court determines Ratcliff's admission was voluntarily, the court concludes it was elicited in response to a functional equivalent of questioning. Reed was speaking directly about his presence at the house (which he said was due to the marijuana smell), and Ratcliff offered a statement concerning the marijuana smell. That statement is due to be suppressed.

Ratcliff's offer of half the cash to Detective Reed if Reed would let him go is, however, admissible. The Eleventh Circuit's decision in *United States v. Castro* is on point. 723 F.2d 1527 (11th Cir. 1984). There, two Customs officers observed suspicious activity at a house located on the water as they patrolled the coastline. They docked their boat near the rear of the house and smelled a heavy odor of marijuana coming from the house. They ordered the house's occupants to come downstairs. The defendant, who was the first person to come downstairs, was greeted by an armed agent whose gun was drawn. That agent asked "What in the world is going on here?" The defendant responded, "You want money? We got money." *Id.* at 1529-30. No *Miranda* warnings had been given at that time. *Id.* at 1530. Nevertheless, the Eleventh Circuit determined that although the defendant was subjected to custodial interrogation, the statement he made was not responsive, and was "spontaneously volunteered . . . in a deliberate attempt to commit a totally separate crime—bribery of a law enforcement official." *Id.* Therefore, the court found that the statement was outside the safeguards of *Miranda*.

This same analysis applies here. After Ratcliff consented to a search and Detective Reed observed the safes, Reed asked questions about the safes' contents. This line of questioning is plainly custodial interrogation and the answers are not permissible. However, when Ratcliff offered half the money to Detective Reed if Reed would let him go, it was not responsive and was "spontaneously volunteered . . . in a deliberate attempt to commit a totally separate crime— bribery of a law enforcement official." *Castro*, 723 F.2d at 1530. Ratcliff reiterated the

statement after opening the safe.  These spontaneous statements are outside the safeguards of *Miranda* and are admissible.[9]

Accordingly, Ratcliff's statements concerning (1) the dime bag of marijuana, (2) the marijuana ounce flushed down the toilet, and (3) his responses to Detective Reed's questions about the contents of the safes are due to be suppressed.[10]  Ratcliff's two spontaneous offerings of half the cash to let him go, however, are admissible.[11]

## III.   Conclusion

If the court sat as an armchair quarterback, it would give the following advice to the officers involved in this case.  Don't look in the garage window.  Upon conducting the knock and talk, and after being confronted with suspicious behavior before the door was opened and then the reek of marijuana when it was opened, the best practice may have been to perform a protective sweep of the house, secure Defendant and his residence, and apply for a search warrant.  As part of the search warrant application, the police could have informed the issuing judge that (1) they had performed a knock and talk after an OnStar report of a missing vehicle at the residence; (2) there was a delay in Ratcliff answering the door; (3) during that delay, they heard and saw suspicious activity within the house; (4) when the door finally opened, they smelled a strong odor of marijuana; (5) because of the presence of numerous vehicles and the

---

[9] To be sure, Detective Reed asked how Ratcliff would give him half of the money, and Ratcliff replied, in substance, "Half, right now; let me leave right now."  (Doc. # 34 at p. 253).  But by that point, that statement was repetitive of the admissible statements that were already spontaneously made, and the court need not determine whether it should be suppressed.

[10] Again, the fact that Ratcliff was not given a *Miranda* warning does not impact the voluntariness of the consent he gave to search.  *Villanueva-Fabela*, 202 Fed. Appx. at 427.  The evidence uncovered during that search was sufficient to support the search warrant.

[11] The court is aware that, on November 4, 2015, Ratcliff was given a *Miranda* warning at the Pleasant Grove Police Department, waived his *Miranda* rights, and admitted certain statements.  Those statements have not been specifically challenged by the present Motion.  And, for the reasons stated in this Opinion, that police station confession is not subject to the fruit of the poisonous tree doctrine.  *See Wong Sun v. United States*, 371 U.S. 471 (1963).

suspicious activity that occurred before the door opened, they performed a protective sweep of the residence; and (6) when they conducted the protective sweep, they saw evidence of narcotics and weapons in the house, and a vehicle that fit the description of the missing Escalade in the garage.  But the court's role here is not one of an armchair quarterback.  Rather, the court sits as a District Judge called upon to determine the legality of the conduct of these officers.  Under these circumstances, the officers' conduct, although certainly not textbook, is not a basis to suppress the physical evidence.  It is a basis to suppress some of Defendant's statements.

For all of these reasons, Defendant's Motion to Suppress (Doc. # 15) is due to be granted in part as to Ratcliff's statements concerning (1) the dime bag of marijuana, (2) the marijuana ounce flushed down the toilet, and (3) his responses to Detective Reed's questions about the contents of the safes.  The Motion is due to be denied in all other respects.  A separate order will be entered.

**DONE** and **ORDERED** this August 16, 2016.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE